**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | |
|---|---|
| **DAVID HARWOOD,**         ) | |
|                            ) | |
|     **Plaintiff,**         ) | |
| v.                         ) | **Civil Action No. 1:08-0060** |
|                            ) | |
| **UNITED STATES OF AMERICA,** ) | |
|                            ) | |
|     **Defendant.**         ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the United States' Motion for Summary Judgment (Document No. 22.), filed on January 29, 2009. The Court notified Plaintiff pursuant to Roseboro v. Garrison, 528 F.2d 304 (4th Cir. 1975), that Plaintiff had the right to file a response to the United States' Motion and submit Affidavit(s) or statements and/or other legal or factual material supporting his claims as they are challenged by the United States in moving for summary judgment. (Document No. 24.) Plaintiff has filed a Response to the United States' Motion. (Document No. 25.) Having thoroughly examined the record in this case, the Court finds that the United States' Motion for Summary Judgment should be granted.

**FACTS AND PROCEDURE**

On January 25, 2008, Plaintiff, acting *pro se*, filed a Complaint and Application to Proceed Without Prepayment of Fees.[1] (Document Nos. 1 and 2.) In his Complaint, Plaintiff alleges liability of the United States and the Warden and three Correctional Officers at FPC Alderson under the Federal Tort Claims Act [FTCA], 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2671, *et seq*., for the

---

[1] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

negligent acts and omissions of persons responsible for clearing ice and snow from the visitors' parking lot at FPC Alderson. (Document No. 1.) As a result of his fall, Plaintiff claims that his "finger will not completely straighten or close, making a deformity with his hand, thus daily and 'normal' tasks are difficult and some impossible to do." (Id., p. 6.) Plaintiff seeks compensatory and punitive damages. (Id., p. 6.)

Plaintiff alleges that he slipped and fell when exiting his truck that was parked in the visitors' parking lot at FPC Alderson. (Id., p. 1.) Plaintiff contends that "ice was everywhere" and "there had been no attempt to remove ice from the visitors' parking lot or sidewalks." (Id., p. 2.) Plaintiff asserts that "staff within the Bureau of Prisons were aware of the icy weather that morning [because] they had removed ice from Warden Hickey's driveway." (Id.) Plaintiff claims that "witnesses observed inmates steadily salting streets within the compound of the prison being driven upon by the staff [but] no attempt to remove ice had been done to the visitors' parking lot or walkways." (Id.) Specifically, Plaintiff attaches to his Complaint the following: (1) a letter from Angela McCormick; (2) a declaration from Edward Swaim, Jr.; and (3) a letter from Randi Marcum. (Document No. 1, pp. 13 - 17.) Angela McCormick, an inmate at FPC Alderson, wrote as follows:

> My name is Angela McCormick, register number 41129-074. I am an inmate at Alderson Federal Prison Camp. I have been here since December 22, 2005, and I work at Landscape as a crew leader.
> On the morning of March 4, 2007, I started work at about 7:00 a.m. I was driving the Gator that morning, making sure the crew had salt for their areas. There was no snow, but there was ice everywhere.
> At about 8:15 to 8:30, Lt. Jones stopped me and said that "some . . . old lady had fallen in the visitors' parking lot." She asked if I was allowed to go between the cars in the visitors parking lot. I told her that I had never been told that I couldn't. She asked if I had salt with me, and told me to salt the visitors' parking lot and go in between the cars. "She said to salt . . . it so that it looked like it had been salted," so I did.

(Document No. 1, p. 13.) Next, Edward Swaim wrote the following statement:

2

> I was present in the parking lot of Alderson Federal Prison Camp on March 4, 2007. I witnessed Mr. David Harwood as he slipped and fell on a completely iced over parking area designated for visitor parking. The area was extremely iced over, and no attempt had been made by BOP staff to scrape, salt, or sand the overtly hazardous conditions. Nor were any signs posted to warn of the hazardous conditions. BOP staff were well aware of the hazard, as they had dispatched several inmates to salt/sand and scrape the roadway and sidewalks of the Warden's house.
> As Mr. Harwood stepped from his vehicle onto the ice, he fell very hard, appearing to strike his head. Several of the visitors, myself included, went to his aid. He seemed incoherent and unable to speak, and his finger . . . appeared broken. Prison staff observed him lying on the ground injured, but made no inquires as to his condition, nor offered any help to him. Another visitor, with the help of other visitors, got him into his personal vehicle and transported him to the hospital. It was almost impossible to even stand, it was so slick. Many of the visitors were slipping and nearly falling, myself included. As soon as Mr. Harwood was taken away, BOP staff dispatched inmates to salt the area very heavily. . . .

(Id., pp. 15 - 16.) Finally, Randi Marcum wrote that on March 4, 2007, at approximately 8:00 a.m., "no attempt had been made to clear ice from the parking lot" and there were "no warning signs." (Id., p. 17.) Mr. Marcum, however, contends that he "observed inmates salting the Warden's driveway around Warden's house and garage."[2] (Id.)

By Order filed on May 2, 2008, the Court granted Plaintiff's Application to Proceed Without Prepayment of Fees and directed the Clerk to issue a Summons requiring the United States to file an Answer or otherwise respond to the Plaintiff's Complaint.[3] (Document No. 4.) On May 14, 2008, the United States filed a Motion to Dismiss Individual Defendants and Substitute the United States. (Document No. 6.) In support of the Motion, the United States filed a Certification stating that "[o]n

---

[2] The United States objects to Plaintiff's reliance on Randi Marcum's unsworn statement to oppose the Motion for Summary Judgment. (Document No. 23, p. 7.) The United States contends that the unsworn statement is insufficient to raise a genuine issue of material fact. (*Id.*)

[3] The Court did not require the Clerk to issue Summonses for the persons named individually as Defendants in Plaintiff's Complaint because the United States is the only party that can properly be sued under the FTCA. *See* 28 U.S.C. § 2674.

3

the basis of the information now available with respect to the incidents referred to therein, Deborah Hickey, Warden; Lt. Dave Oaks; Lt. Kerri Jones and C.O. Wendy Honaker, were acting within the scope of their employment as employees of the United States at the time of the incident out of which the claims arose." (Document No. 6-2.) On July 1, 2008, the United States filed its Answer denying Plaintiff's allegations of negligence. (Document No. 9.) By Order and Notice entered on July 16, 2008, the Court set forth specific dates on which certain events must occur. (Document No. 10.) Also on July 16, 2008, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff, advising him of his right to file a response to the United States' Motion to Dismiss Individual Defendants. (Document No. 11.) The parties filed their "Rule 26(f) Report of Planning Meeting" on August 20, 2008. (Document No. 13.) In the Rule 26(f) Report, the parties consented "to have a United States Magistrate Judge conduct any and all further proceedings in the case, including trial, and order the entry of a final judgment." (Id., p. 3.) On September 9, 2008, the Court conducted a Scheduling Conference and entered a Scheduling Order. (Document Nos. 17 and 18.) By Order entered on September 26, 2008, the Court granted the United States' Motion to Dismiss Individual Defendants. (Document No. 19.)

On October 15, 2008, Plaintiff filed a Response to the United States' Answer. (Document No. 20.) In his Response, Plaintiff alleged that a staff member was aware that Plaintiff fell in the parking lot and that the snow removal equipment had not been dismantled for the season. (Id.) On January 29, 2009, the United States filed a Motion for Summary Judgment. (Document No. 22.) The United States argues that summary judgment should be granted based on the following: (1) "Based upon the testimony of the plaintiff, there was no ice on the visitors' parking lot at FPC Alderson on the morning of March 4, 2007. Accordingly, it was, as a matter of law, reasonably safe"; and (2)

4

"Alternatively, if as plaintiff alleged, that the visitors parking lot was ice covered, then based on the Complaint that condition was open and obvious to all. Therefore, as a matter of law, the United States owed plaintiff no duty of care as plaintiff had a duty to discover the ice and act accordingly for his safety." (Id.) In support of the Motion, the United States attaches the following: (1) The deposition of David Harwood (Document No. 22-2.); (2) The Declaration of Sr. Officer Wendy Honaker (Document No. 22-3.); and (3) The Declaration of Lt. Dale Oakes (Document No. 22-4.).

In his deposition, Plaintiff explains that due to his wife's imprisonment he moved from Kingsport, Tennessee, to Alderson, West Virginia. (Document No. 22-2, pp. 5 - 6.) Plaintiff states that he initially lived in his truck, but later began living at a local Catholic church in Alderson, West Virginia.[4] (Id., p. 11.) Plaintiff testifies that he always visits his wife on visiting days at FPC Alderson. (Id.) Plaintiff explains that on March 4, 2007, he arrived outside the prison at approximately 4:00 a.m. and "got in line."[5] Plaintiff states that "I was always first. I've been that way you know for the last six years. I've always been up ahead of the line." (Id., p. 14.) Plaintiff explains that a line would form outside the prison, the prison would open its gates at approximately 7:45 a.m., visitors would proceed to the visitors' parking lot, and then visitors would "line up again at the visitor center." (Id., pp. 15 - 16.) Plaintiff testifies that he fell when he exited his truck in the visiting parking lot on March 4, 2007. (Id., p. 19.) Plaintiff describes his fall as follows:

> Well, we just went up and, umh – we just drove up there. And I – like I say, I was usually the first one. The first one – one of the first ones in the parking lot.

---

[4] Plaintiff testified that he support himself financially by "volunteering at the hospitality house." (Document No. 22-2, p. 10.) Plaintiff explained that the hospitality house paid him "a little bit" to chop wood, mow grass, and "keep the grounds up." (*Id.*)

[5] Visiting hours at Alderson are from 8:00 a.m. to 3:15 p.m. on Thursday, Friday, Saturday, and Sunday. (Document No. 22-2, pp. 18 - 19.)

> And I just got my – you got a change bag. And I just got my form, and stepped out of the truck. Went – my feet went straight up in the air. And I was laying there on the ground. An I had folded this finger back.

(Id., pp. 19 - 20.) Plaintiff states that during his wait for the front gates to open, "there had been a little mist falling, a little rain," but he did not notice any buildup of ice or snow on his truck or windshield. (Id., pp. 29 - 30.) Plaintiff admits that he did not notice any ice during his drive from the front gate to the visitors' parking lot. (Id., p. 22 and 29.) Plaintiff further testifies he did not notice if anyone was putting out salt because "I wasn't noticing much."(Id., p. 25.) Specifically, Plaintiff explains as follows:

> And I can't remember if they were – had salted the road or not. Because I – I don't – I wasn't paying any attention, you know. I was – I had been down there in line. I was – I just – I – after all those years, I – I don't – I don't pay – look around much. I've seen about all I want to. And I – I do know that all the – anytime there was any ice or snow, they always took care of it, you know before eight o'clock, so that – before the visitors pull in.

(Id., p. 29.) Plaintiff acknowledges that "most of the time they put down excessive salt." (Id., p. 28.)

In Officer Honaker's declaration, she states that she is a Senior Officer at FPC Alderson. (Document No. 22-3, p. 1.) Officer Honaker declares she began her shift at approximately 8:00 a.m. on March 4, 2007. (Id.) Officer Honaker describes the morning of March 4, 2007, as follows:

> On March 4, 2007, when I went to unlock the Visiting Room, two inmate visitors, Jerry Devilbiss and Michael Soehenge, advised me that visitor David Harwood had fallen in the parking lot when he got out of his truck. I was advised that he had hit the back of his head, his hip, and possibly broken his pinky finger. Mr. Soehenge advised me that he was taking Mr. Harwood to the hospital. No one mentioned to me that Mr. Harwood fell on ice in the visitors' parking lot.

(Id.) Officer Honaker states that Mr. Harwood returned to the Visiting Room at approximately 12:14 p.m. and stated that "he had broken his finger and was a little sore and stiff." (Id.) Officer Honaker acknowledges that she "made a note of the events of March 4, 2007, in the Significant Entry

6

Visitor's Room Log Book." (Id.)

In Lt. Oakes' declaration, he states that he is a Lieutenant at FPC Alderson. (Document No. 22-4). On March 4, 2007, Lt. Oakes' shift began at midnight and ended at 8:00 a.m. (Id., p. 1.) Lt. Oakes' acknowledges that BOP procedures require that significant events occurring during his shift must be recorded by the Control Room Officer in the Control Room Log Record. (Id.) Lt. Oakes describes the events of March 4, 2007, as follows:

> At 1:00 a.m., I completed verifying the inmate count. At 4:50 a.m., I began my rounds at FPC Alderson in which I personally inspected the various grounds and facilities at FPC Alderson including the condition of the roads, sidewalks, and parking lots. I inspected the visitors' parking lot and the roadway from the prison entrance to the visitors' parking lot which distance is approximately 0.5 miles. By 6:07 a.m. on March 4, 2007, I had completed my inspection. At 6:30 a.m. the compound was opened, which allowed the inmates to go to breakfast and to their jobs. Whether the compound is open or closed is the decision of the Operations Lieutenant. At 7:00 a.m. the Central Dining Room ("CDR") was opened for breakfast.
> At 7:03 a.m. as a precaution for the safety of the inmates, staff, and visitors, I dispatched two inmates from the Landscape Crew to spread salt on the roadways, sidewalks, and parking lots. While I do not now recall whether it was ice or snow, or the threat of ice or snow, that prompted me to have salt spread, I do recall a light snow falling when I was leaving FPC Alderson at the end of my shift. However, at no time did I observe that the sidewalks, roadways, and parking lots were ice or snow covered. If I had believed that ice or snow had accumulated and posed a safety issue, then I had the authority to close the prison compound, which means that the inmates must remain in their housing units until the unsafe condition is corrected. Also, the Visiting Room would not open until the unsafe condition is corrected. The Control Room Log shows that the compound was open and the CDR was open, and thus I am confident that the sidewalks, steps, and parking lots were not covered with snow or ice.

(Id., p. 2.) Lt. Oakes further states that "if during my shift I determined that an accumulation of ice or snow may be a safety issue, then I have the Control Center Officer to call out the needed number of the Landscape Crew and their equipment to remove the snow and ice, first starting with front entrance, main road and visiting area to include the visitor parking lot before moving on to the rest

7

of the institution." (Id., p. 3.) Lt. Oakes acknowledges that he had "two Landscape Crew members called out to spread salt" on March 4, 2007, at 7:03 a.m. (Id.) Lt. Oakes explains as follows:

> The conditions of the roads, sidewalks, and parking lots were not hazardous when I called out the two members of the Landscape Crew. Salting these areas was a precaution, not a necessity, due to the weather. If the road, sidewalks, and parking lots were snow or ice covered, then I would have closed the compound and called out the entire Landscape Crew to remove the snow or ice.

(Id., p. 4.) Lt. Oakes claims that "[b]efore my shift ended at 8:00 a.m. on March 4, 2007, I specifically recall the inmates were done salting the main road and visiting area and were working on salting the inside roads, sidewalks, and parking lots." (Id., p. 3.)

On July 16, 2008, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Plaintiff, advising him of his right to file a response to the United States' Motion for Summary Judgment. (Document No. 24.) On February 18, 2009, Plaintiff filed his Response in opposition to the United States' Motion for Summary Judgment. (Document No. 25.) First, Plaintiff disputes that he stated there was no ice in the visitors' parking lot. (Id., p. 2.) Specifically, Plaintiff argues that "[m]y statement was, I was not aware of the ice when I drove onto the parking lot." (Id.) Plaintiff appears to allege that he was not aware of the ice because it was "clear ice, glare ice or black ice." (Id.) Plaintiff explains that he would not have been aware of black ice because it is transparent and "takes on the color of the material it lies on top of, often wet asphalt or a darkened pond." (Id.) Finally, Plaintiff contends that the declarations of Officer Honaker and Lt. Oakes should be disregarded because there are discrepancies in their testimony. (Id., pp. 2 - 4.)

On February 25, 2009, the United States filed a Reply. (Document No. 26.) First, the United States argues that Plaintiff should not be allowed to "raise a genuine issue of material fact to defeat summary judgment by changing or revising his deposition testimony." (Id., p. 1.) Specifically, the

United States contends that "in contradiction of his sworn deposition testimony, [Plaintiff] now argues that he was not 'aware' of the ice when he drove into the parking lot and now tries to suggest that he wasn't 'aware' of the ice because it was 'clear ice' or 'black ice.'" (Id.) Next, the United States asserts that the "Duty Officer Report" and "Lt. Jones' log" do not contradict or create a genuine issue of fact concerning the Declarations of Officer Honaker and Lt. Oakes. (Id., pp. 2 - 4.) Finally, the United States acknowledges that the Declaration of Mr. Swaim "by itself would appear to create a genuine issue of material fact as to the condition of the visitors' parking lot. However, taking Mr. Swaim's statement in context with all the other testimony leads to a different conclusion." (Id., pp. 5 - 7.)

On March 9, 2009, Plaintiff filed his "Response to the United States Reply" arguing that "the Plaintiff and Defendant within this case continue to disagree" as to the facts. (Document No. 27.) Specifically, Plaintiff states as follows:

> United States Attorney Horn refers to Plaintiff's deposition saying he was unaware of ice on the parking area before he stepped out of his truck. The staff within Alderson prison were very aware by their records as well as their statements. However, the times, where and how they attempted to clear the ice is differing within the statements and logs of the government.
>
> Government's Reply (page 3) states Lt. Jones would not have known that the Gator and the tractor had already salted the visitors' lot when she came on duty. When in truth changing of personnel at any and each post, the leaving staff member 'debriefs' the on coming person as to status of ongoing operations of the said post. Lt. Oakes had a responsibility to bring Lt. Jones abreast of the current state of Alderson prison and grounds.

On March 11, 2009, the United States filed a "Motion to Strike Plaintiff's Surreply" contending that "[s]urreplies are generally not allowed and when allowed only with leave of court 'for rare circumstances as where a movant improperly raises new arguments in a reply.' King v. Knoll, 399 F.Supp.2d 1169, 1174 (D. Kan. 2005). In this action the United States raised no new arguments in

its Reply (Docket 26), and therefore, there is no basis to grant any motion by the plaintiff to file a surreply. Furthermore, Plaintiff's Response to the United States' Reply is improper hearsay, supposition, and conjecture which is unsupported by any deposition, declaration, or any documentary evidence."[6]

A Pretrial and Final Settlement Conference was scheduled in this case on April 28, 2009. (Document No. 18.) Plaintiff was required to appear in person or by counsel and did not do so. The United States appeared by Stephen Horn, Assistant United States Attorney, and Lara Crane, Special Assistant United States Attorney. During the conference, the United States made an oral Motion to Dismiss for Failure to Prosecute. The United States argued that dismissal was appropriate based upon Plaintiff's (1) failure to submit his Rule 26(a)(3) disclosures, (2) failure to submit his portion of the proposed integrated pretrial order, and (3) failure to appear for the Pretrial and Final Settlement Conference. (Document No. 33.) By Order entered on April 30, 2009, the Court notified Plaintiff of his right to file a response to the United States' Motion. (Document No. 34.) On May 6, 2009, Plaintiff filed a letter-form Response to the United States' Motion to Dismiss for Failure to Prosecute. (Document No. 37.) Specifically, Plaintiff stated as follows:

> I am very sorry about the court's loss of time on the 28th of April, 2009. Had I have known, I would have walked to be there. I thought that I would be notified by U.S. Mail anytime I would have to appear. Also I received the attached notice from

---

[6] Local Rule of Civil Procedure 7.1(c) provides that "[s]urreply memoranda shall not be filed except by leave of court." *See also Johnson v. Ford Motor Co.*, 2005 WL 2353469 (S.D.W.Va. Sept. 26, 2005)(stating that the "motion to strike is granted because plaintiff's surreply is not permitted by either the Federal or Local Rules of Civil Procedure.") Plaintiff did not request leave of the Court to file his surreply. Additionally, no new arguments were raised in the United States' Reply. While the United States is correct in these regards and Plaintiff's surreply is not properly before the Court, the Court is disinclined to strike it from consideration in view of the less stringent standard applicable in this case by virtue of Plaintiff's *pro se* status. The Court will therefore consider "Plaintiff's Response to the United States Reply" as it relates his assessment of the evidence.

> United States Attorney Stephen M. Horn that his client, the United States government, did not wish to make an offer of settlement. I sincerely wish to prosecute this case. The motion I filed for a Court appointed lawyer was for this very reason. I understand some things, but most of it I don't. Again, I am very sorry for the court's loss of time because I was not there. I pray you will allow me to continue with this case.

(Id.) On May 7, 2009, the United States filed its "Reply in Support of its Motion to Dismiss for Failure to Prosecute." (Document No. 38.) By Memorandum Opinion and Order dated May 27, 2009, the Court denied the United States' Motion to Dismiss for Failure to Prosecute. (Document No. 39.)

## **THE STANDARD**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322-23, 106 S.Ct. at 2552-53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will

support Plaintiff's claims, summary judgment is appropriate.

## ANALYSIS

"[T]he mere happening of an accident is legally insufficient to establish liability." See McMillion v. Selman, 193 W.Va. 301, 303, 456 S.E.2d 28, 30 (1995). There must be evidence in this case of alleged negligence that the United States owed Plaintiff a duty to take care and breached it through some act, or omission to act, as should have been reasonably expected to result in Plaintiff's fall and produce Plaintiff's injury thereby causing his fall and injury. In other words, Plaintiff must point to facts which indicate that the United States' negligence was the proximate cause of his fall and injury. See Judy v. Grant County Health Dep't, 210 W.Va. 286, 291 - 92, 557 S.E.2d 340, 345 - 46 (2001). Generally, under West Virginia law the *sine qua non* of premises liability is "foreseeability that harm may result [to a person lawfully upon the premises] if [care] is not exercised." Mallet v. Pickens, 206 W.Va. 145, 522 S.E.2d 436 (1999). The West Virginia Supreme Court of Appeals stated as follows in Mallet, 206 W.Va. at 446 - 447, 522 S.E.2d at 155 - 156:

> The ultimate test of the existence of a duty to use care is found in the foreseeability that harm may result if it is not exercised. The test is, would the ordinary man in the defendant's position, knowing what he knew or should have known, anticipate that harm of a general nature of that suffered was likely to result?
> \* \* \*
> We hold that, in determining whether a defendant in a premises liability case met his or her burden of reasonable care under the circumstances to all non-trespassing entrants, the trier of fact must consider (1) the foreseeability that an injury might occur; (2) the severity of the injury; (3) the time, manner, and circumstances under which the injured party entered the premises; (4) the normal or expected use made of the premises; and (5) the magnitude of the burden placed upon the defendant to guard against injury.

A landowner's duty to remove snow and ice from its premises is a duty to "use due and proper care to see that its sidewalks are reasonably safe for persons exercising ordinary care and

prudence." Eichelberger v. United States, 2006 WL 533399 (N.D.W.Va. Mar. 3, 2006), citing Walker v. Memorial Hospital, 187 W.Va. 5, 12, 45 S.E.2d 898, 901-02 (1948). A person lawfully upon the premises of another, assumes all "normal, obvious or ordinary risks attendant on the use of the premises." There will therefore be no premises liability for injuries as a consequence of hazards which are "obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant." Estate of Helmick v. Martin, 192 W.Va. 501, 505, 453 S.E.2d 335, 339 (1994), quoting Burdette v. Burdette, 147 W.Va. 313, 318, 127 S.E.2d 249, 252 (1962). Although a person has a duty to exercise ordinary care to avoid hazards, "a person is not bound to be continuously looking under penalty that if he fails to do so and is injured his own negligence will defeat recovery of damages sustained." Wise v. Crown Construction Co., 164 W.Va. 393, 264 S.E.2d 463 (1980); also see Rankin v. S.S. Kresge Co., 59 F. Supp. 613, 618 (N.D.W.Va. 1945)(stating that a customer "has the right to assume that such storekeeper has discharged his duty in the exercise of reasonable and ordinary care, to keep the premises...in a reasonably safe condition for travel [and] [h]e is not required to look constantly at the floor...in an effort to discover and avoid slipping upon foreign substances"). Increased care, however, is required of a "foot-traveler" in icy conditions. Eichelberger, 2006 WL 533399 at *3. "The mere slipperiness of a sidewalk, occasioned by ice or snow, not being accumulated so as to constitute an obstruction, is not ordinarily such a defect as will make the city [or other landowner] liable for damages occasioned thereby." Id.

      The Court finds that there are no genuine issues of material fact. Lt. Oakes states that he observed no weather related hazards during his inspection of the premises, which was completed by 6:07 a.m. (Document No. 22-4, p. 2.) Similarly, Plaintiff acknowledges that he did not observe any snow or ice buildup on his truck during his four hour wait outside the prison gates. (Document

No. 22-2, pp. 29 - 30.) At 7:03 a.m., Lt. Oakes called two members of the Landscape Crew to spread salt on the roads, sidewalks, and parking lots as a precaution. (Document No. 22-4, p. 2.) Ms. McCormick, the leader of the Landscape Crew, states that she began work at approximately 7:00 a.m. "driving the Gator . . . making sure the crew had salt for the areas."(Document No. 1, p. 13.) Plaintiff was allowed onto the prison grounds at approximately 7:45 a.m. and admits that he did not see any ice and did not notice whether the roadway leading to the visitors' parking lot had been salted because "I wasn't noticing much." (Document No. 22-2, pp. 22 - 25.) Lt. Oakes acknowledges that it was snowing and the Landscape Crew was spreading salt at the end of his shift at 8:00 a.m. (Document No. 22-4, p. 3.) Mr. Swaim declares that the visitors' parking lot was "completely iced over" making the conditions "overtly hazardous" at approximately 8:00 a.m. (Document No. 1, p. 14.) According to Lt. Jones' Duty Officer Report, salt was spread on the visitors' lot at approximately 8:30 a.m. following Plaintiff's fall. (Document No. 26, p. 13.) Further, Ms. McCormick acknowledges that Lt. Jones told her to salt between the cars in the visitors' parking lot at approximately 8:30 a.m. (Document No. 1, p. 13.) Although Plaintiff contends that Lt. Jones' Duty Officer Report is evidence contradicting Lt. Oakes' testimony, the Court disagrees. The fact that Lt. Jones ordered that salt be spread at approximately 8:30 a.m. does not contradict Lt. Oakes' testimony that he ordered that salt be spread at approximately 7:00 a.m.[7] Although Plaintiff presents Mr. Swaim's statement in an attempt to infer that Lt. Jones' 8:30 a.m. order was the first action taken by the prison officials to maintain the premises, this inference is inappropriate as Mr. Swaim would not have been aware of Lt. Oakes' attempt to maintain the property prior to 8:00 a.m. because Mr. Swaim was outside the prison gates.

---

[7] Lt. Oakes' shift ended at 8:00 a.m. and Lt. Jones' shift began at 8:00 a.m.

Based on the foregoing, the Court finds that the undisputed evidence indicates that the weather conditions were changing on the morning of March 4, 2007.[8] Lt. Oakes observed no ice or snow accumulation at 6:00 a.m., but Mr. Swaim declares that everything was iced over and "overtly hazardous conditions" existed at 8:00 a.m. Thus, it was at least as foreseeable to Plaintiff, who was waiting outside the prison gates for approximately four hours prior to entering the visitors' parking lot, as it was foreseeable to the staff at FPC Alderson that the premises could be icy.[9] Assuming that the visitors' parking lot was ice covered, the Court must consider whether Plaintiff exercised ordinary care and prudence under the circumstances. A landowner is not required to warn invitees of open and obvious dangers. Harpers v. McShain, 394 F.2d 480, 481 (4th Cir. 1968)(In West Virginia, an invitee entering the premises of another has the duty to discover open and obvious dangers.) Thus, the United States argues that if the parking lot was ice covered as alleged by Plaintiff and Mr. Swaim, Plaintiff "had a duty to discover it and take appropriate steps for his safety." (Document No. 23, p. 9.) Plaintiff acknowledges that he was focused on being first in line and "wasn't noticing much" at the time of his fall. (Document No. 22-2, pp. 22 - 25.) To the extent Plaintiff argues that his lack of attention is immaterial because the parking lot was covered with "black ice," the undersigned finds this argument to be without merit. Plaintiff's claim that the visitors' parking lot was covered with "black ice" is self-serving and without factual support.[10] Mr.

---

[8] Although Plaintiff presents letters and statements from Mr. Swaim and Mr. Marcum, the witnesses present testimony relating to the condition of the premises after approximately 8:00 a.m., which is when prison gates opened.

[9] Plaintiff testified that during his wait for the front gates to open, "there had been a little mist falling, a little rain." (Document No. 22-2, pp. 29 - 30.) Lt. Oakes declared that it was snowing at the end of his shift at 8:00 a.m. (Document No. 22-4, p. 2.)

[10] Generally, courts "consider self-serving opinions without objective corroboration not significantly probative. *Evans v. Techs. & Applications Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996).

Swaim's statement indicates that the icy condition of the visitors' parking lot was obvious. (Document No. 25, p. 2.) Additionally, there is no evidence that other visitors fell in the parking lot due to icy conditions on the morning of March 4, 2007. The Court, therefore, concludes that the icy condition of the visitors' parking lot was open and obvious and Plaintiff failed to exercise ordinary care in discovering the icy condition. See Eichelberger, 2006 WL 533399 at *3(stating that increased care is required of a "foot-traveler" in icy conditions). Furthermore, the Court concludes that the icy condition in the visitors' parking lot was the result of a continuous condition of freezing rain and a landowner has no duty to remove ice or snow during the pendency of a storm.[11] Phillips v. SuperAmerica Group, Inc., 852 F.Supp. 504, 506 (N.D.W.Va. 1994)(holding that a gas station owner owed no duty to invitee to remove snow and ice from premises during pendency of snowstorm, and was not liable for injuries suffered by invitee who slipped and fell).

Even assuming prison officials owed Plaintiff a duty to remove the ice from the premises, the Court concludes that prison officials used reasonable care under the circumstances in its maintenance of the visitors' parking lot. The evidence reveals that even though Lt. Oakes observed no hazardous conditions during his inspection of the premises at approximately 6:00 a.m., he ordered the Landscape Crew to spread salt as a precaution at approximately 7:00 a.m. Ms. McCormick states that she began "making sure the crew had salt for their areas" at approximately 7:00 a.m.[12]

---

[11] Defendant contends that "there was a significant icing event that was occurring in the visitors' parking lot around 8:00 a.m., which condition was different from that observed by Lt. Oakes when he finished his inspection at 6:07 a.m." (Document No. 26, p. 6.) Lt. Oakes states that there was a "light snow falling" at the end of his shift at 8:00 a.m. (Document No. 22-4, p. 2.) Plaintiff testified that during his wait for the front gates to open, "there had been a little mist falling, a little rain." (Document No. 22-2, pp. 29 - 30.)

[12] The Court notes that the United States withdrew "its objection to Ms. McCormick's statement and requests that the Court consider it in deciding this motion, if needed." (Document No.

(Document No. 1, p. 13.) Plaintiff appears to contend that the Landscape Crew salted the Warden's driveway, but failed to salt the visitors' parking lot.[13] Lt. Oakes, however, testifies that "[b]efore my shift ended at 8:00 a.m. on March 4, 2007, I specifically recall the inmates were done salting the main road and visiting area and were working on salting the inside roads, sidewalks, and parking lots." (Document No. 22-4, p. 3.) Lt. Oakes explains that it is procedure to "remove the snow and ice, first starting with front entrance, main road and visiting area to include the visitor parking lot before moving on to the rest of the institution." (Id., p. 3.) Thus, the evidence demonstrates that inmates were finished salting the main road and visiting area prior to visitors entering the premises and prior to the salting of the Warden's driveway. The Court, therefore, concludes that prison officials used reasonable care and were proactive in calling out the Landscape Crew to spread salt as a precaution to possible inclement weather. Accordingly, considering the Mallet factors – the foreseeability to the staff at FPC Alderson and Plaintiff that Plaintiff's injuries would occurred; the nature of Plaintiff's injuries; the time, manner and circumstances under which they occurred; and the intended use of the premises where Plaintiff was injured – and the responsibility of Plaintiff as legally established, the Court concludes that the staff at FPC Alderson did not breach the duty to use

---

26, p. 4.)

[13] Plaintiff and Mr. Swaim appear to reach this conclusion because they observed inmates salting the Warden's property, but did not observe the salting of the visitors' parking lot. Specifically, Mr. Swaim states that "BOP staff were well aware of the hazard, as they had dispatched several inmates to salt/sand and scrape the roadway and sidewalks of the Warden's house." (Document No. 1, p. 15.) The evidence, however, demonstrates that the visitors' parking lot was salted prior to Plaintiff and Mr. Swaim entering the premises. Furthermore, prison officials' mere act of salting the Warden's driveway does not prove that prison officials were aware that the visitors' parking lot was icy. *See Eichelberger*, 2006 WL 533399 at \*6(stating that "[e]ven if the maintenance crew was cleaning ice in other areas of the compound, this neither establishes nor provides factual support for the claim that Duty Officer Johnson, or any other prison official, was aware of the icy conditions on the ramp prior to Eichelberger's fall").

care in the maintenance of the premises and the United States cannot therefore be held liable under the FTCA. Summary judgment is therefore appropriate.

Based on the foregoing, it is hereby **ORDERED** that the United States' Motion for Summary Judgment (Document No. 22.) is **GRANTED**, Plaintiff's Complaint be **DISMISSED** (Document No. 1.), and this matter be removed from the Court's docket. The Clerk is directed to mail a copy of this Order to Plaintiff, who is acting *pro se*, and deliver a copy to counsel of record.

ENTER: July 23, 2009.

R. Clarke VanDervort
United States Magistrate Judge